Herbert C. Parker and Inez G. Parker v. Commissioner.Parker v. CommissionerDocket No. 72820.United States Tax CourtT.C. Memo 1961-176; 1961 Tax Ct. Memo LEXIS 177; 20 T.C.M. (CCH) 893; T.C.M. (RIA) 61176; June 15, 1961Edward B. Benjamin, Jr., Esq., Whitney Bldg., New Orleans, La., for the petitioners. S. George Voss, Esq., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1955 in the amount of $7,312.83. The issue for decision is whether a redemption by H. C. Parker, Inc., of 53 of petitioners' 88 shares of that corporation's stock is "essentially equivalent to a dividend." Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Herbert C. Parker (hereinafter sometimes referred to as "Parker") and Inez G. Parker (hereinafter sometimes referred to as "Inez"), petitioners are husband and wife who reside at New Orleans, Louisiana. For the calendar year 1955, petitioners filed a joint income tax return with the district director of internal revenue, New Orleans. On September 10, 1926, Parker, *180 Inez, and Henry LeSassier organized H. C. Parker, Inc. (hereinafter sometimes referred to as "the Company"), to engage in the business of selling office equipment. Parker transferred to it $15,000. In order to qualify his wife as a director, he had her put in $100 out of the $15,000 and had one share of stock issued in her name for convenience only. Prior to and until August 11, 1955, Parker was the president and managing officer of the Company. Parker and his wife have three children, two girls and a boy. Neither of the girls owned any stock in the Company at the time of the redemption in question. Parker's son (hereinafter sometimes referred to as "Parker Jr.") is an architect by training and experience. He joined the Company in 1932 as head of its contract department. He had been active in the Company for approximately 23 years prior to 1955, and was the treasurer and second-in-command of the Company until August 11, 1955. During at least the two-year period prior to 1955, differences of opinion concerning the Company arose between Parker and Parker Jr. These differences involved such matters as whether to remodel the Company's building, whether to improve the facilities for*181 displays in the building, how the salesmen should be handled, whether to expand, and whether to increase or decrease sales expenses. From the very beginning of the differences between Parker and Parker Jr., the latter had taken the initiative in suggesting to Parker that he sell his stock in the Company to Parker Jr. Parker's previous refusals to do so had been one of the differences between himself and Parker Jr. Parker Jr.'s determination to buy out his father also stemmed from pressures exerted on Parker Jr. by his wife. Parker Jr.'s wife indicated that if Parker (then in his early seventies) should die, Parker Jr. would be penalized by the fact that his sisters would inherit a substantial part of the Company's stock and would profit from Parker Jr.'s sales efforts, while the latter would be responsible for his sisters' welfare. Parker Jr. also wanted his wife to have security if he died and wanted her not to have to contend with his sisters, their attorneys and husbands. The differences between Parker and Parker Jr. grew progressively worse until mid-1955. In reaching his decision to sell his stock to Parker Jr., Parker was motivated not only by the managerial and family*182 planning differences between himself and his son but also by his age, his desire to travel, and his outside responsibilities as president of the State Society of the Sons of the American Revolution and as a director of the New Orleans Symphony, the New Orleans Opera House Association, the New Orleans Arts Association, and the Delgado Art Association. In arriving at a price of $50,000 for all of his stock, which represented 49.7 percent of the outstanding shares, Parker estimated that the value of the business at that time was approximately $100,000 and took one-half of that amount. In making his estimate of $100,000, Parker took into account the approximately $8,000 loss the Company had sustained by mid-1955. Parker's sale was made during a loss year of the Company, and the Company has continued to lose money every year since his sale. The books and records of the Company reveal the following as to net profit (or loss) on the dates indicated: 12-31-53$ 351.5512-31-547,509.847-31-55(8,269.66)8-31-55(9,799.56)12-31-55(8,292.03)12-31-56(2,036.95)12-31-57( 185.09)12-31-58(5,655.83)The books and records of the Company show the following*183 condition of the Company as to surplus on the dates indicated: 12-31-53$74,826.7612-31-5482,336.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,400.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,056.6312-31-5544,564.1612-31-5643,454.5812-31-5743,269.4912-31-5837,613.66The books and records of the Company further show the following: 195319541955Sales$457,550.65$600,143.89$413,045.98Cost of Sales342,352.87478,929.96312,225.45Officers Salaries42,899.6240,500.1636,833.44Other Salaries40,673.3841,645.9143,507.11Other Expenses34,488.6635,709.4532,213.66Total Expenses$118,423.21$117,855.52$112,554.21195619571958Sales$386,002.04$505,854.83$492,996.19Cost of Sales283,564.77402,750.00396,806.61Officers Salaries34,079.0836,674.8832,749.83Other Salaries39,992.3335,472.6037,209.69Other Expenses33,710.0434,782.1236,415.62Total Expenses$107,781.45$106,729.60$106,357.14On August 11, 1955, prior to the redemption, the capital stock ledger account showed a credit balance of $17,500. Parker Jr. considered that it would be difficult for him to secure the entire $50,000*184 to buy all of Parker's stock at one time, and suggested that instead he buy approximately 60 percent initially with an "option" to buy the rest later. Parker discussed the matter with John A. Maught (hereinafter referred to as "Maught"), tax advisor for Parker, Parker Jr., and the Company. Parker then agreed to sell to Parker Jr. 53 shares of his stock in the Company and give Parker Jr. an "option" to purchase the remaining shares in four annual approximately equal installments. The total price was to be $50,000. All discussions which Parker had in agreeing to sell, in fixing the price, and in agreeing to the "option" was based upon his stock being bought by Parker Jr. Once the price and terms were agreed on, Parker had nothing further to do with the transaction until he was presented a paper which he and his wife signed on August 11, 1955. Parker Jr. approached James Gilly (hereinafter referred to as "Gilly"), senior vice president of the Whitney National Bank of New Orleans, in order to obtain a loan from the bank with which to finance his purchase of 60 percent of his father's stock. Gilly suggested that it would be much better from Parker Jr.'s standpoint for income tax purposes*185 if the Company bought the stock, and suggested that Parker Jr. look into that possibility and check the tax consequences. Gilly assured Parker Jr. that the bank would lend him the money in either event. Parker Jr. then told Sidney J. Parlongue (hereinafter referred to as "Parlongue"), attorney for Parker, Parker Jr., and the Company, of his discussion with Gilly and asked him to draw up an agreement for Parker to sell to the Company. This talk with Parlongue occurred on August 9th or 10th, 1955. Parlongue drew the agreement as a sale by Parker to the Company. This document, dated August 9, 1955, was the first such document drawn by Parlongue for Parker Jr. Parlongue advised Parker Jr. that he saw no difference in tax consequence resulting from the change of purchaser from Parker Jr. to the Company. Parlongue gave the proposed agreement to Parker Jr. who took it to Maught. Parker Jr. asked Maught to examine the proposed agreement to see if it was favorable for Parker Jr. and his father, and in the best interests of both. Maught, who was 74 at the time, was an active tax counsellor and public accountant. He assumed that the document brought him by Parker Jr. provided for a sale*186 by Parker to Parker Jr. in accord with Maught's previous discussion with Parker. Maught suggested corrections in the document Parker Jr. showed him. Maught suggested that a provision for six percent interest on the whole $50,000 be deleted because it might cause the document to be treated as a closed transaction for the sale of 100 percent of Parker's stock in 1955, rather than just a sale of 60 percent with an "option" to purchase the remaining 40 percent later. Maught also objected - on the ground that it was at least superfluous - to a provision reserving to Parker and his wife the rights to vote and receive dividends on their remaining stock prior to exercise of the "option." Maught also suggested that Inez be named in the document in addition to Parker. Based upon his assumption that the document provided for a sale by Parker to Parker Jr., Maught approved the document after making his suggested modifications. Parker Jr. made notes of Maught's modifications on a yellow legal pad and took the document and his notes back to Parlongue's office for redrafting. Parlongue personally retyped the document at home on August 10, 1955, because time was of the essence. Because he thought*187 there might be further corrections he did not type up any copies of this document, which was dated August 10, 1955. Parker Jr. took Parlongue's personally-retyped document of August 10, 1955, to the Company's office and had the Company's secretary, Marguerite T. Rush (hereinafter referred to as "Rush"), retype it on August 11, 1955 (with minor changes in phraseology and with the date shown as August 11th instead of August 10th), making a carbon copy. Parker Jr. then presented the August 11, 1955, document to Parker for signature. This was the first time Parker saw any proposed agreement and he was surprised that the Company was buying because in the prior discussions he and Parker Jr. had talked only of Parker Jr.'s buying and being the sole owner. Parker had not been around the office while Parker Jr. was working on the August 9, 1955, and August 10, 1955, agreements with the professional advisors; he had been at home. However, Parker was informed by Parker Jr. that having the Company buy was the way Parker Jr. wanted to arrange the purchase. Parker Jr. told his father that he had checked the document with both Parlongue and Maught, and that they had approved the legal aspects, *188 the accounting aspects, and the tax aspects. For these reasons, Parker saw no difference from his point of view between selling to Parker Jr., as previously planned and discussed with Maught, and selling to the Company as provided in the document. Parker and Inez, therefore, signed the August 11, 1955, agreement. The August 11, 1955, document provided that Parker and Inez would sell 53 shares of their 88 shares of stock in the Company for $30,113.54 cash. A promissory note for $30,000 in favor of Whitney National Bank of New Orleans was executed by Parker Jr. on behalf of the Company, and was personally endorsed by Parker Jr. on August 11, 1955. Parker was paid $30,113.54 by Company check dated August 15, 1955. On August 11, 1955, Inez' certificate for one share and Parker's certificates for 6 and 81 shares, respectively, were cancelled by the Company and a new certificate was issued by the Company to Parker for 35 shares. Immediately prior to and subsequent to the redemption, stock in the Company was held as follows: Aug. 10, 1955Aug. 11, 1955SharesSharesHeld%Held%Parker8749.73528.7Inez10.600Parker Jr.8347.48368.0Rush42.343.3175100.0122100.0*189 On August 11, 1955, the capital stock ledger account was reduced by $5,300, i.e., from $17,500 to $12,200. The redemption and option were authorized by the Company's board of directors on August 11, 1955, and were approved by its stockholders on August 15, 1955. The board's authorization was couched in the following language: Mr. Parker Jr. then moved that the resolution as outlined in writing by our attorney and tax consultant be adopted by the stockholders. Mr. H. C. Parker Sr. seconded the motion and it was carried. Mrs. Rush then moved that the President [Mr. Parker Jr. by earlier election at that same meeting] be authorized to sign two agreements as drawn up by our attorney and tax consultant, to effect the resolutions adopted in the above minutes. The motion was seconded and unanimously adopted. The minute book of the Company shows that Parker resigned as president of the Company on August 11, 1955, at a board meeting at which he was nominated and elected as chairman of the board, Parker Jr. was nominated and elected as president, Inez was nominated and elected as vice president, and Rush was nominated and elected as secretary and treasurer. The articles of incorporation*190 of the Company show that the only specifically authorized officers of the Company were a president, a vice president, a secretary and a treasurer. No office of chairman of the board was specifically authorized by the articles. The articles have never been amended. Parker was elected as chairman of the board as a gesture of respect and recognition for past services. The title was honorary because he had no official or other duties and there was no work attached to the office. He is listed in the minutes as having been present at the board meeting of December 27, 1955, and the meeting of January 15, 1957. The minutes do not indicate whether he was present at the March 4, 1958, meeting. Those are the three board meetings held since August 11, 1955. Being given the honorary title never made an impression on Parker, so that he completely forgot that it had ever occurred. At the time of trial, Parker did not know whether or not he still had the honorary title. He has never attempted to exercise any of the duties, rights, or privileges of a chairman of the board. Although Rush told the city directory salesman to list Parker as chairman of the board in the 1956-57 city directory, Parker*191 did not know about this action. He was not so listed on the Company's letterhead. After August 11, 1955, Parker went to the office of the Company nearly every day to get his personal mail when he was downtown for luncheon at his club. One of the reasons Parker felt it desirable to go by the Company's office from time to time was that he was glad to do whatever he could do to help out after the Company's post-1955 losses started to appear. One of Parker's objectives in doing occasional work at the Company was to try to minimize the Company's losses and put in into a profitable position so that it would then speedily exercise its "option" to buy his remaining shares. Parker Jr.'s point of view was that permitting Parker to keep in touch with the business would prolong his good health. Because the Company was sustaining losses and he thought he might be able to make some contribution to the profit picture by becoming a little more active in the last couple of years, Parker spent perhaps an hour or two a day, several days a week, at the Company's office. In the former period since mid-August 1955, he had spent only an hour or two a week there. Another reason that Parker went by*192 the Company's office on a number of occasions was that William J. Bradley, the internal revenue agent who was auditing Parker's and Inez's return and examining the Company's records, requested Parker to meet him there so that they could go over Parker's records together in connection with the four or five items they were discussing. However, Parker has not kept regular office hours at the Company at any time since mid-August 1955. Since mid-August of 1955, Parker has not managed the Company, has not had authority to hire and fire, has not had authority to institute, direct or control policy, has not had authority to enter into leases or contracts on behalf of the Company, and has not had any duties as an employee or officer of the Company. Parker Jr. uses his old desk. Parker has not had any relations with the Company's sources of supply. He has exercised no supervision over the Company's salesmen. Parker has not had any responsibility for dealing with customers of the Company. Sometimes an old customer whom Parker used to wait on ten or fifteen years previously asks him to take care of an order. Parker occasionally signed small miscellaneous checks for the Company as a matter*193 of convenience when such a check was needed immediately and no one else was around who was able to sign. However, he has not signed payroll checks or accounts payable checks. The checks which Parker has signed were signed with Parker Jr.'s knowledge. These checks would have been initiated and approved by Parker Jr. and Rush, as president and secretary, respectively, of the Company, or by Rush in Parker Jr.'s absence. Parker did not, and did not have the authority to, initiate, prepare or approve any checks himself. On August 11, 1955, a Whitney National Bank of New Orleans form resolution was executed by the Company which authorized checks and promissory notes of the Company to be signed only by Parker Jr., as president. The Company's signature card was marked by the Whitney National Bank of New Orleans to reflect this resolution on August 16, 1955. A special meeting of the stockholders of the Company was held on August 15, 1955, authorizing Parker Jr., as president, to sign "any and all notes or documents" for the Company. On May 16, 1956, a Whitney National Bank of New Orleans form resolution was executed authorizing checks and promissory notes of the Company to be signed by Parker*194 Jr., as president, and Parker, or either of them. A signature card reflecting this resolution was delivered to the Whitney National Bank of New Orleans on May 21, 1956. Parker never knew of the August 11, 1955, Whitney Bank form resolution, and assumed that he was authorized to sign small, miscellaneous checks as aforesaid. Parker does not remember signing the May 16, 1956, Whitney Bank form resolution, but he does remember that the bank has always honored his signature. Parker has always been interested in advertising and advertising copy, planning of circular letter campaigns, and related matters. He enjoyed continuing that activity, which required a couple of hours a month. However, he was not in charge of the Company's advertising. He merely suggested on a voluntary basis his thoughts to Parker Jr. and the latter did whatever he pleased. Parker Jr. did not always follow, but on occasions rejected or changed, Parker's suggestions. Parker Jr. and Rush decided to retain Parker's name on the Company's stationery when they bought new letterheads following Parker Jr.'s becoming president on August 11, 1955. No title was shown after Parker's name. Parker Jr. and Rush thought it*195 desirable that Parker's name continue to be identified with the Company because Parker had many contacts in his age group that Parker Jr. did not have and because it was possible that a sale that might not have resulted otherwise could result from the continued use of Parker's name. Subsequently, new stationery was ordered at Parker's suggestion that did not show his name on it at all. This was done because Parker said he was not active enough to have his name appear. The Company's bank loan, endorsed by Parker Jr. personally, has not yet been paid off; the books and records of the Company reveal the following balances in the bank loan ledger account on the following dates: 8-31-55$30,000.0012-31-5528,750.0012-31-5627,926.6112-31-5737,965.8812-31-5824,000.00On August 10, 1955, Parker, Inez, and the Company entered into an agreement under which, in consideration of Parker's past services, Parker and Inez (or the survivor) were to receive $6,000 per year, payable semi-monthly, for life. The Company has made lifetime retirement payments to retired nonstockholder employees in the past and is still making such payments to one such retired employee. *196 Parker was paid $2,500 for the five months between August 1, 1955, and December 31, 1955. On December 31, 1955, Parker was paid a $600 Christmas present or bonus for his services as president during the major portion of 1955. Parker Jr. received $1,000 as a bonus at the same time. No bonuses have been paid by the Company to anyone in any subsequent year. Parker was paid $500 per month during 1956 and 1957 under the retirement agreement. However, in 1958 Parker received only $2,750 - less than onehalf of what he was entitled to under the retirement agreement - and in 1959 Parker only received $500 - one-twelfth of what he was entitled to under the retirement agreement - because the Company was not able to pay more. Parker was willing to accept less because he wanted the firm to reduce its losses. The August 11, 1955, document and the two prior drafts provided that Parker and Inez were desirous of disposing of, and the Company was desirous of acquiring, all of their 88 shares of stock. Since Parker was immediately selling only 53 shares, the August 11, 1955, document and both prior drafts had Parker and Inez grant to the Company an "option" to acquire their remaining 35 share of*197 stock. Although referred to as an "option" both in the documents and by the parties, the language actually used in the August 11, 1955, document and both prior drafts was that an "option" was granted: on the following terms and conditions, to-wit: The said corporation to pay to H. C. Parker Sr. and Mrs. H. C. Parker, Sr. $5113.66 on or before August 1st, 1956 and the said Parkers are to transfer to the Corporation 9 shares of the stock of H. C. Parker, Inc. and on or before August 1st, 1957 the sum of $5113.66 for which the said Parkers will transfer 9 shares of the stock of the corporation and on or before August 1st, 1958, the corporation will pay the sum of $5113.66 and the said Parkers will transfer 9 shares of the stock of the corporation, and on or before August 1st, 1959 the corporation will pay the sum of $4545.48 and the said Parkers will then transfer his or her remaining 8 shares of the stock in the corporation. The August 11, 1955, document and both prior drafts provided that the "option" was "accepted by [the Company] when the first transfer of stock was made by Mr. and or Mrs. H. C. Parker Sr. to the corporation and thereafter, the said Mr. and Mrs. Parker Sr. *198 are bound to abide by the terms of this agreement and complete the transfer of the stock in accordance therewith." Parker and his wife transferred 53 shares to the Company on the same day as the execution of the August 11, 1955, document. The August 11, 1955, document and both prior drafts provided that "in the event of the liquidation of the corporation during the term of the life of this agreement that the agreement shall be considered as having terminated." The August 11, 1955, document and both prior drafts also provided that the agreement of Parker and Inez to sell their remaining shares to the Company was not to be affected by the death of Parker or Inez, or both, but was to be binding upon their heirs and executors. Although the Company has not yet exercised its "option," it is considered by the parties thereto to be in full force and effect. On July 30, 1956 - prior to the first specified payment date - Parker, Inez, and the Company (through Parker Jr. as its president) entered into an agreement extending the deadline for the first payment of the deferred sales price under the "option" agreement from August 1, 1956, to August 1, 1958. Prior to August 1, 1958, Parker, Inez, *199 and Parker Jr. (as president of the Company) agreed verbally to extend the "option" further. The option was extended to August 1, 1960, by written confirmation dated November 27, 1959, of a prior verbal agreement to do so. In the statutory notice mailed to petitioners on January 31, 1958, the Commissioner made the following determinations: (a) It has been determined that you realized income in the amount of $30,113.54 representing dividends received by you from H. C. Parker, Inc. upon the cancellation of 53 shares of capital stock of H. C. Parker, Inc., owned by you. * * *(e) It has been determined that you realized taxable gains from sales of capital assets during the year in the amount of $716.92 rather than in the amount of $13,123.69 as shown on your return. The determinations set forth in the above paragraph is the only adjustment in issue. If the Court sustains petitioners with regard to paragraph (a) of the Commissioner's determination set forth above, petitioners concede that they then are not entitled to be sustained with regard to the issue under paragraph (e) of that determination. The redemption here at issue was not essentially equivalent to a dividend. *200 Opinion Petitioners claim the transaction is a sale of property and that their profit is taxable as a capital gain. Respondent argues that the redemption is a distribution under section 3011 which, on the facts here found, would be taxable as a dividend. The main issue of this case is whether the redemption is excepted from section 301 treatment by virtue of section 302(b)(1), as being "not essentially equivalent to a dividend." 2The relevant portions of the Internal Revenue Code of 1954 are set forth in the margin. 3*201 The effect of the redemption was to transfer effective control of the corporation from Parker to his son, with whom he had had substantial controversy about the running of the business prior to the redemption. This transfer of control, preceded by disagreements as to the management of the Company, so affects the total factual picture as to persuade us that, notwithstanding the family relations involved, this redemption of petitioners' stock only was not essentially equivalent to a dividend. See Estate of Arthur H. Squier, 35 T.C. 950, (March 16, 1961); cf. Thomas G. Lewis, 35 T.C. 71 (1960). Applying the language of section 1.302-2(a), Income Tax Regulations, we hold that the redemption here at issue did not have "the same effect as a distribution without any redemption of stock." The parties note that the phrase "essentially equivalent to a dividend" appears both in section 302(b)(1) of the 1954 Code, applicable to this case, and in section 115(g)(1), which regulated redemptions of stock under the 1939 Code. 4*202 Respondent contends that the constructive ownership rules of section 318 must be applied in determining essential equivalence to a dividend under section 302(b)(1); that Congress intended to confine section 302(b)(1) to non-voting preferred stock redemptions and minority stock redemptions; and that, in any event, this redemption does not qualify for sale or exchange treatment even under the more liberal rule of section 115(g)(1) of the 1939 Code. Petitioners contend that the test under section 302(b)(1) is the same as that under section 115(g)(1) of the 1939 Code and that they meet this test. In Thomas G. Lewis, supra, we applied the attribution rules of section 318. In that case, however, the findings are devoid of any reference to controversy or adversity of interest among the various shareholder interests. The sole question was whether stock owned by a decedent's daughters and their husbands was attributable to the decedent's estate which held the balance of the stock involved. We decided that it was and held that "In these circumstances, and taking into account all other evidence before us, we conclude and find that the redemption herein was essentially equivalent*203 to a dividend." That the issue of essential equivalence to a dividend is to be resolved in the light of all the facts and circumstances involved received further emphasis in Estate of Arthur H. Squier, supra, where we reached an opposite result based upon the record before us. In Squier, the taxpayer's actual ownership (absent attribution) was reduced from 50.09 percent to 41.27 percent. Attributing to his estate the stock of related shareholders, the taxpayer estate's ownership was reduced from 63.30 percent to 56.82 percent. We recognized that our decision in the Lewis case had been based "to a significant extent" upon application of the attribution rules of section 318, indicating that even in the earlier case we did not consider those rules to be conclusive in all events and irrespective of other evidence on the issue of whether or not there had been a significant change of controls. 5 We went on to state: Moreover, the record herein reveals a sharp cleavage between the executor and members of the Squier family, and in spite of the attribution rules as to stock "ownership," the redemptions herein in fact resulted in a crucial reduction of the estate's control*204 over the corporation. Accordingly, notwithstanding the attribution rules, the redemptions in this case did result in a substantial dislocation of relative stockholdings in the corporation and also in fact brought about a significant change in control. We think these circumstances serve to distinguish the Lewis case. * * * (Italics in original.) An important factor relied upon to differentiate Squier from Lewis was the existence in Squier of a large minority interest (36.70 percent prior to redemption and 43.18 percent subsequent*205 to redemption). The minority stockholder, Schilling, was unrelated and there is no indication in our findings that he played any part in the controversies involved. In the instant case, the only minority interest is relatively insignificant, that of Rush. There is no evidence that Rush bore any family relationship to the other stockholder interests and in pressing the applicability of attribution rules, the respondent makes no suggestion that Rush's stock should be attributed. While the absence of a significant unrelated minority interest makes this a weaker case than Squier, nevertheless, after taking the entire record into account, including the relationships involved and the history of sharp and continuing disagreement between Parker and Parker Jr., we conclude on the unusual facts presented that the redemption brought about a significant change of control and we hold that the redemption here at issue was not essentially equivalent to a dividend under section 302(b)(1) but was a distribution in payment in exchange for the stock. Decision will be entered under Rule 50. Footnotes1. All statutory references are to the Internal Revenue Code of 1954 unless noted otherwise. ↩2. The redemption of Inez's one share did not terminate her interest within the meaning of section 302(b)(3). On the date of the redemption she was elected vice president of the Company. Under section 302(c)(2)(A), the attribution rules would result in her being considered the owner of Parker's and Parker Jr.'s shares. Neither was the transaction a substantially disproportionate redemption under section 302(b)(2). The attribution rules clearly apply to that paragraph and cause the redemption to be disqualified under section 302(b)(2)(B) and (C)↩.3. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * *(c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges. - (1) Redemptions not equivalent to dividends. - Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. * * *(c) Constructive Ownership of Stock. - (1) In general. - * * * section 318(a) shall apply in determining the ownership of stock for purposes of this section. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection. SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK. (a) General Rule. - For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable - (1) Members of family. - (A) In general. - An individual shall be considered as owning the stock owned, directly or indirectly, by or for - (i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and (ii) his children, grandchildren, and parents.↩4. Prior to 1950, this provision was Sec. 115(g) of the 1939 Code. The same provision appeared as Sec. 115(g) in the Acts of 1932, 1934, 1936, and 1938.↩5. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 233 (1954), wherein the Senate Finance Committee declared with respect to its version of section 302 (the version finally enacted): Unlike the House bill, however, section 302↩ does not provide specific statutory guides governing the tax consequences of every stock redemption. In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry. * * *